IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Harry James Nix,              ) <br>              ) <br>           Plaintiff,   ) <br>              ) <br>    vs.              ) <br>              ) <br> Carolyn W. Colvin, Acting   ) <br> Commissioner of Social Security,   ) <br>              ) <br>        Defendant.   ) <br>              ) | Civil Action No. 6:14-71-JMC-KFM <br><br> **REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on April 21, 2011, alleging that he became unable to work on March 1, 2011. The applications were denied initially and on reconsideration by the Social Security Administration. On November 18, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Dr. Daniel C. Lustig, an impartial vocational expert, appeared on July 11, 2012, considered the case *de novo*, and on July 25, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 8, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)     The claimant has not engaged in substantial gainful activity since March 1, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq*.).

(3)     The claimant has the following severe impairments: seizure disorder; degenerative disc disease; depression; and residuals from fractures of tibia, ulna, and clavicle (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except the claimant is not able to climb ladders, ropes, and scaffolding. The claimant is able to frequently climb ramps or stairs and occasionally balance, stoop, kneel, crouch, or crawl.  The claimant must avoid concentrated exposure to hazards.  The claimant is able to understand, remember, and carry out simple instructions.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on April 30, 1964, and was 46 years old, which is defined as a younger individual age 45-49,

2

on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

3

five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Medical Evidence

On February 27, 2011, the plaintiff was treated for sciatica, alcoholism, and seizure at Barnwell County Hospital.  His seizure was observed by staff members in the emergency room, and he was admitted to the hospital.  The plaintiff had back and leg pain, with the pain radiating from his right hip to his foot.  An x-ray of the lumbar spine showed severe disc space narrowing at L5-S1 with vacuum disc phenomenon and moderate anterior spondylolisthesis.  There was adjacent spondylosis of the endplate of L5 with the endplate of S1.  An MRI was recommended.  The plaintiff reported drinking a twelve pack of beer a day and smoking more than a pack of cigarettes per day.  The plaintiff had a normal joint and lower extremity examination, and had a normal gait.  He was discharged on March 1, 2011, and was continued on his home medication and given Ultracet for pain (Tr. 233-42).

5

In March 2011, the plaintiff presented to Low Country Health Care System with complaints of pain down his right foot. He was given Mobic and Flexeril (Tr. 535-36).

On April 1, 2011, the plaintiff was transported to the hospital after a seizure. He was in a postictal state with muscle twitching upon arrival. The plaintiff had right leg and hip pain. He was confused and diaphoretic (sweating profusely) after a seizure in the emergency room (Tr. 247-48). The plaintiff had not been compliant with his seizure medication, Dilantin (Tr. 247). He was prescribed Dilantin and Librium and was also given Lyrica for neuropathic pain (Tr. 246). At a follow up appointment, the plaintiff reported feeling better (Tr. 537). On April 26, 2011, the plaintiff returned with lower back and right hip pain that radiated to his right leg. It was painful to walk, and he was prescribed Toradol (Tr. 228-31).

In June 2011, the plaintiff hit a tree while driving after he had a seizure (Tr. 260, 464). At the time of the accident, he had not been taking Dilantin (Tr. 464). The plaintiff fractured his left ankle, left arm, and right clavicle (Tr. 260-61). Over a two-week hospital stay, the plaintiff underwent corrective surgery to repair the three fractures and began occupational therapy (Tr. 301-09, 359-76).

On August 2, 2011, the plaintiff was tender to palpation to the right clavicle, left wrist, left tibia and dorsum of his foot. His range of motion of the left elbow was 80 to 100 degrees of flexion, he had 4/5 muscle strength in his thumb, fingers, and wrist, as well as limited range of motion of the left ankle. He had numbness near the surgical site of his right upper extremity (Tr. 382-84). On August 19, 2011, the plaintiff was still non-weight bearing to his left upper and lower extremities. He was partial weight bearing (less than five pounds) in the right upper extremity. His range of motion in the left elbow was 80 to 100 degrees of flexion and he still had 4/5 strength to his thumbs, fingers, and wrist. His left wrist and left ankle range of motion was limited due to stiffness (Tr. 429-32). On September 13, 2011, the plaintiff reported right shoulder and left foot pain. He had been

6

using his CAM boot walker on his left leg and a wrist splint on the left wrist.  He had pain in his right clavicle, left wrist, and left leg.  His elbow extension was 20 degrees and flexion was 90 degrees.  He had no active range of motion of his wrist due to pain (Tr. 421-23).

On August 11, 2011, James Weston, M.D., reviewed the plaintiff's records and opined that he plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, and stand, walk, and sit six hours in an eight-hour workday.  The plaintiff should never climb ladders, rope, or scaffolds.  He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The plaintiff should avoid all exposure to hazards due to his seizures (Tr. 400-403).  On  October 19, 2011, Darla Mullaney, M.D., reviewed the plaintiff's records and essentially affirmed Dr. Weston's assessment (Tr. 450-57).  Dr. Mullaney noted that there was no indication that the plaintiff would have severe residual deficits from the fractures (Tr. 455).

On August 12, 2011, Jeanne Wright, Ph.D., reviewed the plaintiff's records and determined that the plaintiff's alcoholism was not a severe mental impairment.  In assessing whether the plaintiff met the "B" criteria of the Listings, Dr. Wright determined the plaintiff had no difficulties in maintaining social functioning; mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 407-17).  In October 2011, Janet Roland, Ph.D., affirmed Dr. Wright's assessment (Tr. 458).

On December 24, 2011, the plaintiff was brought to Barnwell County Hospital after he attempted to wreck his car and kill himself.  He answered his door for the police with a knife in hand hoping they would shoot him (Tr. 507-21). Following a three-day hospitalization, he began outpatient treatment at Aiken-Barnwell Mental Health Center (Tr. 464).  At an initial clinical assessment on January 11, 2012, the plaintiff reported feeling down, not sleeping well, a decreased appetite, and drinking a lot of alcohol (Tr. 469).  He stated he abused alcohol for 19 years, drinking a twelve pack of beer per day (Tr. 469).  He

was cooperative and fully oriented (Tr. 472-73).  He reported getting along "good" with his seven siblings and participating in church activities (Tr. 470).  The plaintiff had a neat and clean appearance, appropriate motor activity, euthymic mood, appropriate affect, normal speech, normal thought process, normal thought content, intact memory, intact concentration, and average fund of knowledge (Tr. 472).  He had no hallucinations or delusions (Tr. 472).  He was diagnosed with major depressive disorder, single episode, moderate (Tr. 473).  His Global Assessment of Functioning ("GAF")[2] score was 55 (Tr. 473).

On March 27, 2012, David K. Bailey, a therapist, noted that the plaintiff showed positive motivation to deal with his issues and had been able to verbalize his problems and how they impact his life (Tr. 462).  The plaintiff had not had alcohol since starting treatment (Tr. 462, 464).  The plaintiff made some progress with his treatment goals.  His mental health provider stated the plaintiff could sustain mental health stability with the help of his support system.  His GAF score was 50 (Tr. 462).

On March 29, 2012, James Ford, M.D., a psychiatrist, also assessed the plaintiff.  The plaintiff was fully oriented and cooperative.  He had an anxious and depressed mood that brightened and an appropriate affect.  Although he had slight problems with articulation and reported seeing bugs, he had a normal appearance, normal psychomotor activity, speech, logical and goal-directed thought process, poor decision making, intact attention, and intact memory.  He reported occasional suicidal ideation, but denied having intent or a plan.  He had no homicidal ideation or delusions.  Dr. Ford

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

prescribed Viibryd and Trazadone and recommended that the plaintiff continue with individual therapy.  He had a GAF score of 45 (Tr. 464-65).

On June 13, 2012, the plaintiff reported to Dr. Ford ongoing depressive symptoms with dysphoria, anergy, anhedonia, social isolation and withdrawal and difficulty sleeping at night.  He also had occasional suicidal ideation.  The plaintiff stated that he was aggravated by ongoing medical problems, including a numbness in his left leg and foot that caused him to fall.  The plaintiff had limited insight and some difficulties with recent memory.  He was fidgety, restless, and distractible.  His mood and was anxious and depressed, and he had a GAF score of 45.  The plaintiff reported taking his medications – Cymbalta and Remeron – as prescribed and denied recent alcohol usage (Tr. 466-67).  On June 25, 2012, Mr. Bailey noted that the plaintiff made improvements and assigned him a GAF score of 50.

### Hearing Testimony

The plaintiff testified that he stopped working due to a problem with a disk in his back.  He lived alone in a mobile home, but he had sisters who lived 50 to 100 yards away from his house.  One of his sisters did his housework.  He did not have a bank account.  He was unable to pay bills because he did not have transportation.  He also testified that he visited with his sister every day, and she drove him places if he needed to go somewhere.  In a typical day, he watched television.  He did not have a computer, and he did not play video games.  He woke up around 6:00 a.m.  His sister prepared his meals and brought them to him.  His sister also did his shopping and his laundry.  She had done those chores for him before the accident (Tr. 37-40).

The plaintiff had a wrist brace on and had difficulty raising his right hand to say the oath.  He had metal in his hand, which caused pain, and extension of his right shoulder also caused pain.  He had a leg brace and hardware in his leg and foot.  He had a hard time getting followup care due to finances.  He had applied for Medicaid and had been denied.  At the time of his accident, he had run out of seizure medication.  The Polly Best Center

9

helped him get his depression medication, but he did not have assistance with his other medication needs.  He had not gone to the free clinics.  He used rubbing alcohol, Tylenol, and Aleve, which helped somewhat to alleviate his pain.  The plaintiff had stopped drinking and was consistently attending his appointments (Tr. 40-41).

The plaintiff testified that he went to the Polly Best Center to talk about his emotional problems and to get depression medication.  He also had problems sleeping at night due to pain.  He was able to get along with his family, and he had one friend.  The plaintiff estimated that he could walk one yard, and he could stand 25 to 30 minutes before he would need to sit down.  He stated he could lift ten to 13 pounds (Tr. 42-43).

The plaintiff testified that he had not been able to take his anti-seizure medication since May 2012 because he could not afford it.  The plaintiff did not know when he was having a seizure.  After a seizure, he was disoriented and had no memory of what had happened.  He thought a seizure caused his car accident.  He no longer drove a car even though he still had a driver's license because he was afraid of having a seizure.  His last seizure had been in May.  The plaintiff stated that his cane helped him walk.  He had a prescription for the walking boot, but he did not have a prescription for the cane.  The plaintiff testified that he also had pain in his collarbone, which was fractured in the accident (Tr. 43-46).

The plaintiff had been referred to Axis One for his drinking problem and had not had any alcohol in 2012, which helped his mental issues.  The plaintiff testified that he enjoyed working.  He was unable to provide for himself, and he did not want to be a burden on his sister.  He had a history of steady work, doing manual labor, but he was no longer able to stand for eight hours (Tr. 46-48).

The vocational expert ("VE") classified the plaintiff's past work as that of mental retardation aide, *Dictionary of Occupational Titles* ("*DOT*") No. 355.377-018, skilled, specific vocational preparation ("SVP") of 6, medium as generally performed and sedentary

as performed by the plaintiff; machine operator, *DOT* No. 600.380-018, skilled, SVP of 6,

medium as generally performed and heavy as performed by the plaintiff; and poultry farm

laborer, *DOT* No. 411.687-018, unskilled, SVP of 2; medium work as generally performed

and light as performed by the plaintiff (Tr. 49).

> The ALJ proposed the following hypothetical:
>
> Assume an individual the same age, education, and work history as Nix. The individual is limited to sedentary work with no climbing of ladders, ropes, and scaffolding, frequent climbing of ramps or stairs, and occasional balancing, stooping, kneeling, crouching, or crawling. The individual must avoid concentrated exposure to hazards and is capable of understanding, remembering and carrying out simple instructions.

(Tr. 49-50).

The VE stated that the individual would not be capable of the plaintiff's past

work. The individual could perform work as a sack repairer, *DOT* No. 782.687-046, SVP

of 2, unskilled, sedentary, with 1,000 jobs nationally; cuff folder, DOT No. 685.687-014,

unskilled, SVP of 2, sedentary, with 1,000 jobs nationally; and label taker, DOT No.

585.685-062, unskilled, SVP of 2, sedentary, with 1,000 jobs nationally (Tr. 50).

The ALJ asked if the individual required the ability to shift position between

sitting and standing at will throughout the workday, would there be any work for such an

individual. The VE stated that the packer, or cuff folder, could get up for a brief period, a

minute at a time, and sit back down, but the jobs cited were primarily seated positions. The

number of jobs available would not be eroded by the sit/stand option. Another job that

would accommodate the sitting and standing at will was order clerk, DOT No. 209.662-022,

unskilled, SVP of 2, sedentary, with 20,000 jobs nationally. There would be no jobs for an

individual that needed rest breaks on an at-will basis throughout a workday (Tr. 50-51).

The plaintiff's sister, Elaine, also testified. She stated that she saw the plaintiff

every day. She cooked, cleaned, and made sure he had everything he needed. She

11

testified that she did not do those things for him prior to the accident. She occasionally brought him meals prior to the accident, but she stated that he prepared his own food before the accident. Either she or her sisters drove the plaintiff to his appointments. Elaine stated that he was taking his mental health medications and he was not drinking alcohol. When the plaintiff had a seizure, his body tensed up and his eyes went back into his head. He trembled and shook and made a noise. The seizures lasted as long as ten to 15 minutes. She witnessed a seizure one month prior to the hearing that lasted 15 minutes. She could not take him to the doctor because they would not treat him due to financial issues. The seizure medication was around $50.00, and she could not afford it. Elaine described some of the plaintiff's medications, but she was unsure what each medication was for (Tr. 53-59).

### *Appeals Council Evidence*

The plaintiff submitted certain evidence to the Appeals Council that was made part of the record (Tr. 2, 6). The Appeals Council found that the evidence did not provide a basis for changing the ALJ's decision (Tr. 2). Specifically, between October and December 2011, the plaintiff underwent 12 physical therapy sessions. His therapist, Jodie Bessinger, PT, noted that the plaintiff made some improvements in strength and range of motion in his left ankle, but only minimal improvement with activity tolerance and pain. Ms. Bessinger recommended continued physical therapy (Tr. 494-506). In April 2012, the plaintiff complained of pain in his left arm and leg, and he was prescribed pain medication (Tr. 541). From August 25, 2012, to September 23, 2012, the plaintiff was seen for counseling at the Polly Best Center. The plaintiff stated that he often became confused and had memory problems. He tried very hard to adhere to his treatment process, but he needed help recalling appointments and taking his medicine. Mr. Bailey assigned the plaintiff a GAF score of 49 on September 23, 2012 (Tr. 543).

The plaintiff also submitted certain evidence to the Appeals Council that was returned to the plaintiff because the Appeals Council found that it was "new information . . . about a later time"[3] (Tr. 2).  The plaintiff submitted a portion of that evidence as an exhibit to his brief in this case (doc. 18-1).  Included is a medical source statement from Dr. Ford dated March 26, 2013.  Dr. Ford indicated that the plaintiff had a fair to poor ability to perform unskilled work and a poor ability to perform semiskilled/skilled work as a result of difficulties focusing, concentrating, and paying attention and with memory function due to depression and anxiety (*id.* at 2-3).  He also indicated that the plaintiff had a fair ability to interact and behave appropriately socially and a poor ability to travel in unfamiliar places (*id.* at 4).  Also included is a letter dated June 3, 2013, from Dr. Ford to the plaintiff's counsel supporting the plaintiff's application for disability benefits. In the letter, Dr. Ford noted that the plaintiff "had been involved in mental health services since December 28, 2011, and has worked hard on his unresolved life issues" (*id.* at 1).  Dr. Ford noted that the main issue bothering the plaintiff is his inability to work due to an on-the-job injury.  Dr. Ford also noted that the plaintiff was committed to working on his unresolved issues and keeps his scheduled appointments on a regular basis.  Dr. Ford concluded by saying that he believes that plaintiff is in need of disability and would benefit from it greatly (*id.*).

## ANALYSIS

The plaintiff was 46 years old on his alleged disability onset date and 48 years old at the time of the ALJ's decision.  He completed high school and had past relevant work experience as a farm laborer, die service operator, and assistant to the handicapped.  The plaintiff argues his case should be remanded for consideration of new evidence submitted to the Appeals Council from his treating mental health specialist, Dr. Ford.  The plaintiff further argues that the ALJ erred by:  failing to adequately explain the findings in the

---

[3]The ALJ issued her decision on July 25, 2012 (Tr. 26).

residual functional capacity ("RFC") assessment and failing to properly evaluate the plaintiff's credibility.

### *Appeals Council Evidence*

The plaintiff first argues that his case should be remanded for administrative consideration of Dr. Ford's March 2013 opinion and June 2013 letter that were submitted to the Appeal Council.  As noted above, the Appeals Council found that the evidence  was "new information . . . about a later time" and thus returned the evidence to the plaintiff and did not make it part of the record (Tr. 2).  "The Appeals Council must consider evidence submitted with a request for review in deciding whether to grant review 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is new "if it is not duplicative or cumulative" and is material if there is "a reasonable possibility that the new evidence would have changed the outcome." *Id*. at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)).  As the evidence at issue is not part of the record, any remand by this court would be pursuant to sentence six of 42 U.S.C. § 405(g), which permits remand for new evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g). Remand on the basis of new evidence is appropriate if: 1)  the evidence is relevant to the determination of disability at the time the application was first filed; 2)  the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; 3)  there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and, 4)  the claimant made at least

a general showing of the nature of the new evidence to the reviewing court. *Borders*, 777 F.2d at 955[4] (citing 42 U.S.C. § 405(g)).

   The Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir.2012), suggests that evidence created after the ALJ's decision may be considered as new and material evidence and given retrospective consideration under certain circumstances.   In *Bird*, the court noted that "an ALJ must give retrospective consideration to medical evidence created after a claimant's last insured date when such evidence may be 'reflective of a possible earlier and progressive degeneration.' " *Id.* at 345. While *Bird* specifically addressed evidence created after a claimant's date last insured, this court has suggested that the holding extends to situations in which evidence arises after the date of an ALJ's decision, but before the Appeals Council makes a decision to grant or deny review. *See Wise v. Colvin*, C/A No. 6:13-2712-RMG, 2014 WL 7369514, at \*6-7 (D.S.C. Dec. 29, 2014) (finding that a treating physician's medical opinion dated three months after the ALJ's decision met the *Bird* standard and thus it was error for the Appeals Council not to consider it); *Dickerson v. Colvin*, C/A No. 5:12–CV–33–DCN, 2013 WL 4434381, at \*14 (D.S.C. Aug. 14, 2013) (holding that a medical opinion dated more than a year after the ALJ's decision was new and material evidence that warranted remand).

   Here, the evidence from Dr. Ford is clearly new as it not duplicative or cumulative.   There was no opinion from Dr. Ford or any other treating physician in the record before the ALJ and the Appeals Council.   Further, the evidence is material as there is a reasonable possibility that the new evidence would have changed the outcome.   The

---

[4] "Though the court in *Wilkins* [*v. Sec'y of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991)] indicated in a parenthetical that *Borders*' four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09–1107, 2010 WL 3199345, at \*3 n.4 (D. Md. Aug.12, 2010) (citing cases).  *See Elkins v. Astrue*, C.A. No. 4:10-2648-TER, 2012 WL 602779, at \*4 n.3  (D.S.C. Feb. 24, 2012).

issue for resolution then is whether the evidence relates to the period on or before the date of the ALJ's decision (July 25, 2012).  Here, Dr. Ford's opinion of the plaintiff's ability to do work-related activities (mental) is dated March 26, 2013, and the letter is dated June 3, 2013 (doc. 18-1).  However, "consideration of the newly submitted material does not depend on the date the record was prepared or whether or not the opinions are explicitly made retrospective." *Wise*, 2014 WL 7369514, at *7.  Rather, "the critical issue is whether there is linkage between the claimant's medical condition during the relevant time period and this new opinion so that it may corroborate earlier and progressive degeneration of the claimant's condition." *Id.* (citing *Bird*, 699 F.3d at 341).  While Dr. Ford does not indicate in the documents that his opinion relates to a particular time period, he states in the letter that the plaintiff "has been involved in mental health services since December 28, 2011" (doc. 18-1 at 1) and notes the plaintiff's "*ongoing* depressive symptoms with dysphoria, anergy, anhedonia, social isolation and withdrawal" (*id.* at 4) (emphasis added).  These exact issues were noted by Dr. Ford in his notes from the plaintiff's treatment on June 13, 2012, which was during the relevant period (*see* Tr. 466).  Notably, also on June 13, 2012, Dr. Ford found that the plaintiff had a GAF score of 45, indicating serious symptoms.  Based upon the foregoing, the undersigned finds that there is linkage between the plaintiff's mental condition during the relevant time period and this new opinion.

Dr. Ford's opinion as to the plaintiff's mental capabilities is particularly important here as there is no other opinion from a treating provider in the record.  The ALJ gave "significant weight" to the opinion of a State agency psychological consultant who found that the plaintiff had only mild difficulties in maintaining concentration, persistence, or pace (Tr. 24; *see* Tr. 407-17).  In contrast, Dr. Ford found that the plaintiff's mental abilities necessary to do unskilled work[5] were poor in the following categories due to his

---

[5]The ALJ found that the plaintiff could perform certain sedentary, unskilled occupations that exist in significant numbers in the national economy (Tr. 25).

depression, anxiety, and difficulties with memory functioning: remember work-like procedures, maintain attention for two hour segment, maintain regular attendance, complete a normal work date without interruptions from psychologically based symptoms, perform at a consistent pace, accept instructions and respond appropriately to criticism, and deal with normal work stress (doc. 18-1 at 2-3). Further, Dr. Ford's opinion is also relevant to the ALJ's credibility finding as the ALJ found that the plaintiff's "depression does not interfere with his concentration" (Tr. 23).

Based upon the foregoing, the undersigned finds that the Appeals Council erred in failing to consider the medical source statement and letter from Dr. Ford. Moreover, the undersigned finds that good cause for failure to incorporate such evidence into the record in a prior proceeding has been shown as the plaintiff timely submitted the evidence to the Appeals Council, and the Appeals Council erred in returning the documents to the plaintiff rather than making them part of the record. *See Wise*, 2014 WL 7369514, at \*7 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 100-102 (1991) (discussing sentence four and sentence six remands under Section 405(g))).

### *Remaining Allegations of Error*

Because the undersigned recommends that this case be remanded for evaluation of the new evidence discussed above, the plaintiff's remaining allegations of error are not specifically addressed. However, upon remand, the Commissioner should take into consideration the plaintiff's remaining allegations of error.

### CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the case be remanded to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of the evidence submitted by the plaintiff (*see* doc. 18-1).

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 20, 2015
Greenville, South Carolina